## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| _____ ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civ. No. 1:24-cv-02010-WMR-JEM |
| ) | |
| COBB COUNTY, GEORGIA, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## THE UNITED STATES' ADDITIONAL BRIEF
## IN SUPPORT OF THE JOINT MOTION FOR
## <u>FINAL APPROVAL OF THE AMENDED CONSENT DECREE</u>

# Table of Contents

I.   BACKGROUND ..................................................................................3

  A.  The Decree Results from a Three-Year Investigation ......................3

  B.  The United States' Statistical Analysis Shows a Statistically Significant Adverse Impact ..................................................................................4

  C.  The Parties Engaged in Over a Year of Settlement Negotiations .................6

  D.  The Decree Provides for Robust Notice to Interested Parties and Has Received Significant Media Coverage ................................................8

II.   ARGUMENT ..................................................................................10

  A.  This Action Involves a Case or Controversy the Court Can and Should Resolve ......................................................................................10

    1.  Title VII and binding precedent provide for jurisdiction to enter Title VII consent decrees based on pre-suit agreements. ...............................11

    2.  Resolutions that may affect the interests of non-parties should involve court oversight. ..........................................................................14

      a.  Court oversight protects the interests of third parties. ...........................15

      b.  Title VII pattern or practice cases are akin to class actions. ..................16

    3.  The Court has a necessary and proper role in approving the relief in the Decree. ....................................................................................17

      a.  A controversy exists here even though the Parties reached an agreement to seek a consent decree before the complaint was filed. ..............................19

      b.  The relief in the Decree is necessary to remedy ongoing harm and bar like discrimination in the future. ..................................................21

        i.  The relief in the Decree is necessary to remedy ongoing harm. .........21

        ii.  The relief in the Decree is warranted to bar like discrimination in the future. ..................................................................................22

  B.  The Relief in the Consent Decree Is Lawful and Should Be Approved .......26

    1.  The Decree is entitled to a presumption of validity. ..................................26

    2.  The Decree represents a reasonable factual and legal determination of the United States' allegations. ................................................................27

      a.  The United States can establish a prima facie case of discrimination. ....29

      b.  The significant statistical disparity established by the United States justifies approving the Decree. ..................................................30

      c.  The relief in the Decree is reasonable and consistent with Title VII. ....33

d.   The effect of the Decree on third parties is neither unreasonable nor proscribed. ..............................................................................35

3.   The Decree is not unconstitutional, unlawful, or against public policy. ...39

a.   The Decree does not involve classifications based on race...................40

b.   The Decree provides for relief only to identified victims of discrimination. ...............................................................................43

c.   The Eleventh Circuit's recent opinion in Fearless Fund does not affect the lawfulness of the make-whole relief the Decree provides......................45

III.   CONCLUSION ..............................................................................47

# Table of Authorities

## Cases

*Adarand Constr., Inc. v. Pena*, 515 U.S. 200 (1995)................................................41

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975)..................................... passim

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974)................................. 13, 28

*American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765
  (11th Cir. 2024) ........................................................................... 40, 45, 46, 47

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) ...................................12

*Carlough v. Amchem Prods., Inc.*, 834 F. Supp. 1437 (E.D. Pa. 1993) ........... 19, 20

*Carson v. Am. Brands, Inc.*, 450 U.S. 79 (1981) .....................................................12

*Castaneda v. Partida*, 430 U.S. 482 (1977)............................................................29

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ...................... 41, 42, 45

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ............................................ 26, 27

*Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News
  Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) ...........................................11

*EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263 (11th Cir. 2000) .........................29

*England v. Kemp*, 976 F.2d 662 (11th Cir. 1992)...................................................15

*Ensley Branch of NAACP v. Seibels*, 616 F.2d 812 (5th Cir. 1980).......................30

*Franks v. Bowman Transp. Co.*, 424 U.S. 747 (1976) ......................... 18, 33, 36, 37

*Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318 (1980).................................. 16, 17

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977)................................29

*Howard v. McLucas*, 671 F. Supp. 756 (M.D. Ga. 1987)................................. 31, 45

*Howard v. McLucas*, 871 F.2d 1000 (11th Cir. 1989)......................... 31, 32, 44, 45

*In re Asbestos Litig.*, 90 F.3d 963 (5th Cir. 1996)..................................................19

*In re Birm. Reverse Discrim. Emp't Litig.*, 20 F.3d 1525 (11th Cir. 1994)...... 39, 44

*In re Emp't Discrim. Litig. Against State of Ala.*, 198 F.3d 1305 (11th Cir. 1999)
  ............................................................................................................. 18, 23, 31

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) .............................40

*Johnson v. Transportation Agency*, 480 U.S. 616 (1987) ......................................46

*Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117 (2d Cir. 1983).... 31, 32

*Lamon v. Ga. S. & Fla. Ry. Co.*, 90 S.E.2d 658 (Ga. 1955)...................................38

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)...............................................15

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421 (1986) .......40

*Louisiana v. United States*, 380 U.S. 145 (1965) ..................................................18

*Martin v. Wilks*, 490 U.S. 755 (1989)....................................................................15

*Moore v. Napolitano*, 926 F. Supp. 2d 8 (D.D.C. 2013) .......................................30

*NAACP v. City of Evergreen, Ala.*, 693 F.2d 1367 (11th Cir. 1982)......................22

*Nash v. Consol. City of Jacksonville, Duval County, Fla.*, 905 F.2d 355 (11th Cir. 1990) ..................................................................................................30

*Peightal v. Metro. Dade Cty.*, 26 F.3d 1545 (11th Cir. 1994)................................29

*SEC v. Randolph*, 736 F.2d 525 (9th Cir. 1984)........................................ 19, 20, 24

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020).......................................................21

*Sims v. Montgomery Cty. Comm'n*, 890 F. Supp. 1520 (M.D. Ala. 1995).............39

*Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982)....................................12

*Stovall v. City of Cocoa, Fla.*, 117 F.3d 1238 (11th Cir. 1997) ................. 12, 15, 26

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ................................................................................... 40, 41

*Swift & Co. v. United States*, 276 U.S. 311 (1928)................................................21

*United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826 (5th Cir. 1975) ......13

*United States v. Baltimore Cty., Md.*, No. CCB-19-2465, 2021 WL 20000480 (D. Md. May 19, 2021).........................................................................................25

*United States v. Burke City Dep't of Soc. Servs.*, No. 1:12cv261 (D.N.C. Aug. 23, 2012) ..................................................................................................13

*United States v. City & Cty. of Denver*, 927 F. Supp. 1396 (D. Colo. 1996)..........17

*United States v. City of Alexandria*, 614 F.2d 1358 (5th Cir. 1980) .............. passim

*United States v. City of Austin, Tex.*, No. 1:14-cv-533-LY (W.D. Tex. Nov. 7, 2014) ..................................................................................................13

*United States v. City of Hialeah*, 140 F.3d 968 (11th Cir. 1998) ................... passim

*United States v. City of Hialeah*, 899 F. Supp. 603 (S.D. Fla. 1994)......... 17, 38, 42

*United States v. City of Jackson*, 519 F.2d 1147 (5th Cir. 1975) .................... 12, 13

*United States v. City of Miami*, 195 F.3d 1292 (11th Cir. 1999).................... 33, 34

*United States v. City of Miami, Fla.*, 614 F.2d 1322 (5th Cir. 1980) .............. 26, 27

*United States v. City of Miami, Fla.*, 664 F.2d 435 (5th Cir. 1981) ............... passim

*United States v. City of N.Y.*, 637 F. Supp. 2d 77 (E.D.N.Y. 2009) .......................30

*United States v. City of Orlando, Fla.*, No. 6:21-cv-00565 (M.D. Fla. Mar. 29, 2021) ..................................................................................................13

*United States v. City of Tampa*, No. 8:23-CV-02934-KKM-AAS, 2024 WL 3193961 (M.D. Fla. June 21, 2024) ..............................................................24

*United States v. City of Virginia Beach*, No. 2:06-cv-189 (E.D. Va. Apr. 3, 2006)13

*United States v. Groveport Madison Local Sch. Dist. Bd. of Educ.*, No. 2:22-cv-2488 (S.D. Ohio June 15, 2022) .....................................................................13

*United States v. Town of Davie, Fla.*, No.12-cv-61249-KMW (S.D. Fla. June 21, 2012) ..................................................................................................13

*United States v. TW Servs., Inc.*, No. C-93-20208, 1993 U.S. Dist. LEXIS 7882 (N.D. Cal. Apr. 1, 1993)..................................................................................13

*United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979)..46

*Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370 (2d Cir. 1991)....................30

iv

*Walters v. City of Atlanta*, 803 F.2d 1135 (1986)....................................................33

**Statutes**

42 U.S.C. § 2000e-2(k)(1)(A)(i) ............................................................. 28, 31
42 U.S.C. § 2000e-2(k)(1)(A)(ii)...............................................................32
42 U.S.C. § 2000e-2(n) .......................................................................... 16, 25
42 U.S.C. § 2000e-6(a). ......................................................................... 3, 11, 18
42 U.S.C. § 2000e-6(b) ...............................................................................11
U.S. Const. Art. III, sec. 2...........................................................................10

**Other Authorities**

*Board to Consider Entering Into a Consent Decree with Dept. of Justice*, Cobb
    County (Apr. 4, 2024) ............................................................................7

*Justice Department Secures Agreement with Cobb County, Georgia, to Resolve
    Allegations of Race Discrimination in Firefighter Hiring Process*, Department of
    Justice (May 9, 2024) ...........................................................................9

Rosie Manins, *Exams, credit checks harmed Black firefighter applicants in Cobb,
    DOJ alleges*, The Atlanta Journal-Constitution (May 9, 2024) .............................9

Sam Sachs, *Cobb commissioners to consider consent decree with USDOJ over
    how county hires firefighters*, WSB-TV (Apr. 5, 2024)........................................9

Taylor Croft, *Cobb fire department faces DOJ settlement over discriminatory
    hiring*, The Atlanta Journal-Constitution (Apr. 5, 2024) ......................................9

Tre'Vaughn Howard, *Georgia County to Pay $750,000 for Race Bias in Fire Dept.
    Hires*, Bloomberg Law (May 9, 2024) .................................................9

At this Court's request, the United States submits this additional brief in support of the Parties' Joint Motion for Final Approval of the Amended Consent Decree, ECF No. 5. During the August 26, 2024 fairness hearing, the Court asked the United States to brief: (1) whether there is a case or controversy that warrants court involvement given Defendant has already agreed to the relief provided by the Amended Consent Decree ("Decree"); and (2) whether the relief in the Decree is permissible under recent Supreme Court and Eleventh Circuit precedent involving the consideration of race in providing benefits in other contexts. Hr'g Tr., ECF No. 9 at 35:2-5; 41:20-42:2. The answer to both questions is yes.

Binding precedent confirms that the Court has jurisdiction to decide this pattern or practice case brought under Title VII of the Civil Rights Act of 1964, as amended. That the Parties reached an agreement to seek a consent decree before the United States filed its Complaint, and that Defendant ceased at least some of the challenged practices during the United States' investigation, neither divests the Court of jurisdiction nor eliminates the Court's role in approving the proposed Decree, resolving any objections to its terms, and effectuating the relief process set out in the Decree. Indeed, on numerous occasions, the Eleventh Circuit has affirmed a district court's approval of a Title VII consent decree filed by the United States along with the complaint. And for good reason: as the Supreme Court has repeatedly explained, Title VII aims to encourage voluntary resolutions that end employment

1

discrimination as efficiently as possible. Moreover, this resolution involves relief to hundreds of individuals and potentially affects the interests of incumbent firefighters. Notably, Congress described Section 707 pattern or practice cases as in the nature of class actions. It is therefore appropriate—and contemplated by Congress and acknowledged by the Eleventh Circuit—that these potentially affected individuals are notified and allowed to be heard in a public, transparent process, as this Court ordered when it provisionally approved the Decree and held the August 26, 2024 fairness hearing.

This Court thus has jurisdiction to enter the Decree, and it should do so because the Decree is not unconstitutional, unlawful, unreasonable, or contrary to public policy. While courts continue to grapple with when it may be lawful to provide a benefit based on race, that question is simply not present here. The Decree does not provide a race-based benefit; it provides precisely the type of relief Title VII and binding precedent authorize: (1) injunctive relief barring the allegedly discriminatory hiring practices going forward; and (2) make-whole relief in the form of back pay, an offer of hire, and retroactive seniority to the specific individuals harmed by those practices. The Supreme Court has repeatedly, and recently, affirmed that such relief is neither based on race nor impermissible. For these reasons, the Court should approve the Decree.

I.      BACKGROUND

A. <u>**The Decree Results from a Three-Year Investigation**</u>

In November 2019, the United States notified Cobb County that the Assistant Attorney General for Civil Rights had authorized an investigation into whether the County, through its fire department ("CCFD"), was engaged in a pattern or practice of discrimination against African Americans or Hispanics[1] with respect to entry-level firefighter hiring. *See* Ex. A, Decl. of Brian McEntire ("McEntire Decl.") ¶ 2. The letter explained that should the United States find a violation, the Attorney General could enforce Title VII by bringing a lawsuit pursuant to Section 707(a), 42 U.S.C. § 2000e-6(a).[2] *Id.* ¶ 2, Ex. 1 at 1.

The United States, through the Department of Justice's Civil Rights Division and the United States Attorney's Office for the Northern District of Georgia, conducted a thorough three-year investigation of CCFD's hiring process. The Parties met in January 2020 to discuss the scope of the investigation and all steps in the firefighter hiring process, including the ACCUPLACER written exam and credit check. *Id.* ¶ 3. The County responded to requests for information and data regarding

---

[1] The United States' investigation did not reveal unlawful disparate impact against Hispanic applicants, so this portion of the investigation was closed.

[2] The United States opened its investigation after reviewing publicly available data and information about CCFD, including media reports that more African Americans were applying for firefighter positions than Whites but were receiving a fraction of job offers as compared to Whites.

its hiring process from 2016 to 2020. *Id.* In November 2020, the United States requested additional documents and information on the ACCUPLACER and credit check, including applicant performance and scores on these selection devices. *Id*. ¶ 4. The County provided the requested information in December 2020 and March 2021. *Id.* ¶ 5. The United States retained Dr. Bernard Siskin, a statistician with over 40 years of experience in applying statistics to the analysis of employment practices, to analyze CCFD data regarding the ACCUPLACER and the credit check. Ex. B, Declaration of Bernard R. Siskin, Ph. D ("Siskin Decl.") ¶ 2. The County continued to respond to follow-up requests for information about the ACCUPLACER and the credit check throughout the investigation.

### B. The United States' Statistical Analysis Shows a Statistically Significant Adverse Impact

Dr. Siskin's analysis found that the County's rank-order use of the ACCUPLACER in 2020 and its use of the credit check from 2016 to 2020 had a statistically significant disparate impact on African-American candidates. *Id.* ¶¶ 11-12, 15. In 2020, applicants had to achieve a passing score on each of three sections (reading, writing, and arithmetic) of the ACCUPLACER. Applicants who passed both the ACCUPLACER and the physical agility test were placed on an eligibility list in order of their total ACCUPLACER score. CCFD then selected applicants to move forward by that strict rank order.

In reviewing the rank-order use of the ACCUPLACER, Dr. Siskin noted that

even though the vast majority of applicants passed the ACCUPLACER, a much smaller percentage of passers had a high enough score to move forward in the hiring process. These individuals are known as "effective passers." *Id.* ¶¶ 6, 11. Dr. Siskin therefore analyzed the difference in the rate at which African-American and White candidates "effectively passed" by scoring high enough to move forward in the hiring process (known as the effective passing rate).[3] *Id.* His analysis of the disparity in effective passing rates demonstrated statistically significant disparate impact against African-American candidates. *Id.* ¶ 11. Dr. Siskin also examined where African-American and White candidates numerically ranked on the eligibility list. The average rank of an African-American passer was more than 100 spots below the average rank of a White passer on the eligibility list. *Id.* ¶ 12. This difference in average rank also demonstrated statistically significant disparate impact against African-American candidates. *Id.* Likewise, Dr. Siskin's analysis demonstrated that the disparity in passing rates between African-American and White candidates on the credit check resulted in statistically significant disparate impact against African-American candidates. *Id.* ¶ 15.

Dr. Siskin next calculated the practical shortfalls caused by these hiring screens. He first determined the passing shortfall: the number of African-American

---

[3] As discussed *infra* in note 19, courts have found that disparate impact discrimination can be established where there is a statistically significant disparity between effective passing rates on a test.

candidates who would have effectively passed the ACCUPLACER or passed the credit check if they had passed at the same rate as White candidates. *Id.* ¶ 8. He then conducted an adjusted hiring shortfall analysis, which involves taking the passing shortfall and calculating how many of these individuals would be expected to pass the remaining steps in the hiring process and be hired. *Id.* ¶ 9.

After the 2020 test administration, CCFD began using a randomizer (i.e., a program that places a list of items in random order) to select candidates who passed both the ACCUPLACER and physical agility test for further processing. *Id.* ¶ 3. Using the randomizer, the ACCUPLACER no longer has a disparate impact against African-American applicants. *Id.* ¶ 14.

### C. **The Parties Engaged in Over a Year of Settlement Negotiations**

On January 17, 2023, the United States notified the County of its determination that the County was engaged in a pattern or practice of discrimination against African-American firefighter candidates, the basis for the determination, and that the Assistant Attorney General had authorized suit. *See* Ex. A, McEntire Decl. ¶ 6, Ex. 4. The letter advised the County that the United States had concluded that the County had violated the disparate impact provision of Title VII based on: (1) the statistically significant disparate impact against African-American candidates resulting from the credit check and the rank-order use of the ACCUPLACER; and (2) the information the County had provided, which failed to demonstrate that the

County's rank-order use of the ACCUPLACER or its use of the credit check were job related and consistent with business necessity, as required by Title VII. *See id.* ¶ 6, Ex. 4 at 2. The letter also set forth the general settlement terms that the United States sought to resolve the matter without contested litigation and invited Cobb County to engage in settlement negotiations. *Id*. at 2-3.

For over a year, the Parties engaged in arduous, arm's-length negotiations on the terms of a proposed consent decree, which ultimately proved successful. The key negotiated terms include prohibiting the County's future rank-order use of the ACCUPLACER and the credit check as well as the back pay and priority hiring relief with retroactive seniority. ECF No. 5-3 ¶¶ 25-26, 31-32, 73. The negotiated provisions also set out a multi-step process for effectuating the remedial relief with court oversight over the process. *Id.* ¶¶ 14-24, 33-65. On April 9, 2024, the Cobb County Board of Commissioners approved the proposed Decree subject to the Court's approval.[4] On May 8, 2024, the United States filed its Complaint. Compl., ECF No. 1. The next day, the Parties filed the Decree with a Joint Motion for Provisional Entry of Consent Decree and Scheduling a Fairness Hearing on the Terms of the Decree. Mot., ECF No. 2 and Am. Consent Decree, ECF No. 2-3.

---

[4] *Board to Consider Entering Into a Consent Decree with Dept. of Justice*, Cobb County (Apr. 4, 2024), https://www.cobbcounty.org/communications/news/board-consider-entering-consent-decree-dept-justice (stating that "[t]he federal district court must approve the consent decree for it to become effective").

**D. The Decree Provides for Robust Notice to Interested Parties and Has Received Significant Media Coverage**

On May 15, 2024, this Court provisionally approved the Decree. Order, ECF No. 3. In doing so, the Court set in motion the Decree's provisions requiring robust notice to those whose interests the Decree may affect and broad publication about the terms of the Decree, including the priority hiring relief and retroactive seniority. The Brief in Support of the Joint Motion for Final Approval of the Amended Consent Decree explains this process in detail. ECF No. 5-1 at 4-6. In sum, all potential claimants received a copy of the Court-approved Notice of Settlement and Fairness Hearing on the Terms of the Decree, Instructions for Filing an Objection, and a blank Objection Form via first-class mail, email, or both. Schwermer-Sween Decl. in Supp. of Mot. for Final Approval, ECF No. 5-4 ¶ 7. The notice also was published in the Marietta Daily Journal. Jackson Decl. in Supp. of Mot. for Final Approval, ECF No. 5-6 ¶ 2. Additionally, all CCFD firefighters received notice via postings on bulletin boards in all CCFD fire stations and on CCFD's intranet. Johnson Decl. in Supp. of Mot. for Final Approval, ECF No. 5-5 ¶ 2.

In addition to the notice provided by the Decree and ordered by this Court, this case has received significant media coverage. On April 4, 2024, the County issued a press release and posted on its website that the Board of Commissioners would be voting on the Decree at its next meeting and summarized key terms of the

8

Decree, including the priority hiring relief with retroactive seniority.[5] Significant press coverage followed.[6] When the United States filed its Complaint, it also issued a press release,[7] resulting in additional press coverage.[8]

Even with this robust notice, significant media coverage, and ample time to object, the claims administrator received only seven objections—all from individuals who may be entitled to relief under the Decree. Schwermer-Sween Decl. in Supp. of Mot. for Final Approval, ECF No. 5-4 ¶ 10. Six of the seven objectors later confirmed that they mistakenly objected, and the seventh individual made no

---

[5] *Id.*

[6] *See, e.g.*, Taylor Croft, *Cobb fire department faces DOJ settlement over discriminatory hiring*, The Atlanta Journal-Constitution (Apr. 5, 2024), https://www.ajc.com/news/atlanta-news/cobb-fire-department-faces-doj-settlement-over-discriminatory-hiring/CQADRSOI5BEQFH3PG7JOBKRTDQ/; Sam Sachs, *Cobb commissioners to consider consent decree with USDOJ over how county hires firefighters*, WSB-TV (Apr. 5, 2024), https://www.wsbtv.com/news/local/cobb-county/cobb-commissioners-consider-consent-decree-with-usdoj-over-how-county-hires-firefighters/EVMVHXKV5FAR5KHQADNV5ZUTZQ/.

[7] *Justice Department Secures Agreement with Cobb County, Georgia, to Resolve Allegations of Race Discrimination in Firefighter Hiring Process*, Department of Justice (May 9, 2024), https://www.justice.gov/opa/pr/justice-department-secures-agreement-cobb-county-georgia-resolve-allegations-race

[8] Rosie Manins, *Exams, credit checks harmed Black firefighter applicants in Cobb, DOJ alleges*, The Atlanta Journal-Constitution (May 9, 2024), https://www.ajc.com/news/atlanta-news/exams-credit-checks-harmed-black-firefighter-applicants-in-cobb-doj-alleges/6XUT4INRIFGO5FSJXBDD6MGG7U/; Tre'Vaughn Howard, *Georgia County to Pay $750,000 for Race Bias in Fire Dept. Hires*, Bloomberg Law (May 9, 2024), https://news.bloomberglaw.com/litigation/georgia-county-to-pay-750-000-for-race-bias-in-fire-dept-hires.

substantive objection and appears to have filed in error. *Id.* ¶ 11-17, Exs. 2-8. No objectors chose to speak at the August 26, 2024 fairness hearing.

## II.   ARGUMENT

### A. <u>This Action Involves a Case or Controversy the Court Can and Should Resolve</u>

Article III of the Constitution extends federal jurisdiction "to all Cases, in Law and Equity, arising under . . . the Laws of the United States, . . . [and] to Controversies to which the United States shall be a Party. . . . " U.S. Const. Art. III, sec. 2. The Court asked if there remains a case or controversy at this juncture given that the Parties filed a Complaint and consent decree simultaneously. That the Parties succeeded in agreeing to resolve their dispute, contingent on court approval, after the United States notified Defendant of its intent to file suit does not eliminate the Parties' controversy or divest this Court of jurisdiction. Title VII explicitly contemplates the use of consent decrees, and the Eleventh Circuit has repeatedly sanctioned the entry of consent decrees resulting from pre-suit agreements between parties. Precluding the Parties from obtaining a consent decree would conflict with both Title VII and binding precedent, and would undermine the transparency, accountability, and finality that court approval of Title VII consent decrees is intended to achieve, particularly where both parties are governmental entities and the interests of non-parties may be affected.

### 1. Title VII and binding precedent provide for jurisdiction to enter Title VII consent decrees based on pre-suit agreements.

Through Section 707 of Title VII, Congress authorized the Attorney General to bring a civil action whenever he has "reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter . . . ." 42 U.S.C. § 2000e-6(a). Section 707 also provides that "[t]he district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section . . . ." 42 U.S.C. § 2000e-6(b). The Supreme Court has cited the explicit grant of authority to the Attorney General to enforce Title VII as an example of when Congress' express authorization to a governmental agency to sue constitutes standing. *Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129-30 (1995).

This Circuit has equally recognized the right of the United States and state and local actors to resolve these pattern or practice cases with consent decrees, declaring that "parties have a right to compromise their dispute on mutually agreeable terms, and these terms may include the incorporation of their settlement into a judicial decree." *United States v. City of Miami, Fla.*, 664 F.2d 435, 440 (5th

11

Cir. 1981) (en banc) (Rubin, J., concurring)[9] ("*City of Miami II*") (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981)).[10, 11] Further, in a case where the consent decree was filed just one day after the complaint, this Circuit described consent decrees as "a highly useful tool for government agencies, since it maximizes the effectiveness of limited law enforcement resources; by reaching agreement with private parties as to the specifics of substantial compliance, the government may avoid the risks as well as costs of full scale litigation of each point." *United States v. City of Jackson*, 519 F.2d 1147, 1149-50, 1151-52 (5th Cir. 1975). Given this precedent and the clear public policy considerations favoring voluntary resolutions, it is unsurprising that courts in this Circuit have routinely approved proposed consent decrees negotiated pre-suit and filed on the same day or effectively together with the

---

[9] The Eleventh Circuit has cited Judge Rubin's concurring opinion as "the opinion of the Court" because "as the introductory per curiam opinion in that case explains, while there is no majority opinion, Judge Rubin's opinion is the narrowest basis for the Court's appellate judgment, and serves as its mandate." *See United States v. City of Hialeah*, 140 F.3d 968, 976 n.2 (11th Cir. 1998).

[10] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981. Although *City of Miami II* was decided after October 1, 1981, it is binding precedent in the Eleventh Circuit because it was decided by the full en banc court of the former Fifth Circuit. *Stovall v. City of Cocoa, Fla.*, 117 F.3d 1238, 1243 n.4 (11th Cir. 1997) (citing *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982)).

[11] While some cases cited herein involve hiring or promotional goals using racial classifications, the United States does not rely on the portions of those cases justifying such goals since the Decree does not involve hiring goals or racial classifications. *See infra* Section II.B.3.a.

complaint in Title VII actions brought by the United States. *See, e.g.*, *United States v. City of Hialeah*, 140 F.3d 968, 972, 984 (11th Cir. 1998) (affirming entry in part of consent decree filed same day as complaint).[12]

Any reading of Title VII by which the United States and a state or local government may only seek court approval of a proposed consent decree after engaging in litigation would undermine Title VII's strong preference for voluntary resolution of employment discrimination cases. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974) ("Cooperation and voluntary compliance were selected [by Congress] as the preferred means for achieving th[e] goal" of assuring equality of employment opportunities); *United States v. City of Alexandria*, 614 F.2d 1358,

---

[12] *See also, e.g.*, *United States v. City of Alexandria*, 614 F.2d 1358, 1360, 1367 (5th Cir. 1980) (reversing and remanding to district court to enter partial consent decree filed together with complaint), *overruled on other grounds as recognized by Dean v. City of Shreveport*, 438 F.3d 448, 452 n.1 (5th Cir. 2006); *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 834 (5th Cir. 1975) (affirming entry of consent decrees filed simultaneously with complaint); *City of Jackson*, 519 F.2d at 1149-50 (consent decree entered one business day after complaint filed); *United States v. City of Orlando, Fla.*, No. 6:21-cv-00565 (M.D. Fla. Mar. 29, 2021) (affirming consent decree filed two days after complaint); *United States v. Town of Davie, Fla.*, No.12-cv-61249-KMW (S.D. Fla. June 21, 2012) (consent decree and complaint filed on the same day). Courts in other circuits have routinely approved consent decrees in these circumstances as well. *See, e.g.*, *United States v. Groveport Madison Local Sch. Dist. Bd. of Educ.*, No. 2:22-cv-2488 (S.D. Ohio June 15, 2022); *United States v. City of Austin, Tex.*, No. 1:14-cv-533-LY, ECF No. 63 at 7 (W.D. Tex. Nov. 7, 2014); *United States v. Burke City Dep't of Soc. Servs.*, No. 1:12cv261 (D.N.C. Aug. 23, 2012); *United States v. City of Virginia Beach*, No. 2:06-cv-189 (E.D. Va. Apr. 3, 2006); *United States v. TW Servs., Inc.*, No. C-93-20208, 1993 U.S. Dist. LEXIS 7882 at * 1 (N.D. Cal. Apr. 1, 1993).

1360, 1366-67 (5th Cir. 1980) (reversing district court's refusal to approve consent decree filed with complaint when "[i]n compliance with the spirit of voluntary conciliation necessary to effectively end discrimination in employment, the defendants and the Justice Department negotiated a consent decree similar to many approved before, and presented it to the district court for approval"), *overruled on other grounds as recognized by Dean v. City of Shreveport*, 438 F.3d 448, 452 n.1 (5th Cir. 2006). In fact, a district court's refusal to enter a Title VII consent decree is an immediately appealable order in part because denial of such appellate review "would be in contravention of the strong public policy favoring voluntary settlement of Title VII cases." *See City of Hialeah*, 140 F.3d at 974 (citing *Carson*, 450 U.S. at 87-88 & n.13); *see also City of Miami II*, 664 F.2d at 445 (finding refusal to enter consent decree an appealable order). By entering the proposed decree in resolution of this case, this Court would be following the text and design of Title VII and the well-established practice in this Circuit and others.

### 2.  Resolutions that may affect the interests of non-parties should involve court oversight.

The nature of this case—and the United States' Title VII pattern or practice docket generally—calls for the oversight and increased transparency a consent decree affords. Indeed, as discussed *infra* in Section II.B.1, just such oversight is contemplated in the Eleventh Circuit's requirement that courts ensure that consent decrees are not "unconstitutional, unlawful, unreasonable, or contrary to public

policy." *Stovall v. City of Cocoa, Fla.*, 117 F.3d 1238, 1240 (11th Cir. 1997).

> *a.  Court oversight protects the interests of third parties.*

The United States recognizes that some of the relief provided by the Decree—specifically the competitive retroactive seniority for order of layoffs and reductions in force ("RIFs")—may affect the interests of incumbent firefighters, albeit minimally because CCFD is understaffed and does not anticipate layoffs or RIFs. Hr'g Tr., ECF No. 9 at 20:5-9. It is for this very reason that the Decree required that incumbents were informed about the Decree's potential effects and allowed them to present any objections to the Court for consideration. Ensuring all potentially affected parties are informed and can object is so important that Congress amended Title VII[13] to protect an employment practice from collateral attack if that practice implements or is within the scope of a litigated *or* consent judgment or order, so long as the person challenging the practice had notice and an opportunity to object.[14] 42

---

[13] Congress added this provision through the Civil Rights Act of 1991 in response to the Supreme Court's decision in *Martin v. Wilks*, which held that White firefighters who had failed to intervene in earlier proceedings in which consent decrees were entered could challenge employment decisions taken pursuant to those decrees. 490 U.S. 755 (1989), superseded by statute as recognized in *Landgraf v. USI Film Prods.*, 511 U.S. 244, 250 (1994).

[14] In the amended provision, Congress identified three vehicles that a party can use to protect employment practices from collateral attack: (1) a litigated judgment; (2) a consent judgment; and (3) a consent order. *See* 42 U.S.C. § 2000e-2(n). Thus, Congress contemplated a scenario in which parties could agree to a resolution short of a litigated judgment that is necessarily entered by a federal court, hence the words "consent judgment" and "consent order," terms often used interchangeably with "consent decree." *See, e.g.*, *England v. Kemp*, 976 F.2d 662, 665 (11th Cir. 1992).

U.S.C. § 2000e-2(n) (emphasis added). That is what the Parties requested here.

In exchange for protection from collateral attack, which provides finality to the Parties and those entitled to relief under the Decree, the Parties expose their agreement to the rigorous public process provided for in the provisionally approved Decree—robust notice directed specifically to those whose interests may be affected, notice published in a local newspaper, the opportunity to submit an objection, and a fairness hearing to consider any objections. Had the Parties kept their settlement private and not under federal court supervision, these individuals would not know about how it might affect them and would have had no opportunity to object to allow a court to decide if their rights were impermissibly burdened. A public, transparent process monitored by the Court best promotes the balancing of interests of third parties, employers, and victims of discrimination.

  b.  *Title VII pattern or practice cases are akin to class actions.*

Unlike private plaintiffs, the United States' primary purpose in resolving a case like this one is pursuing the public interest. *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 326 (1980). The public interest in equal employment opportunity includes, among other things, seeking appropriate relief for individuals harmed by a state or local government employer's discriminatory conduct. The United States therefore seeks to recover for the over 200 former CCFD firefighter candidates harmed by CCFD's discriminatory hiring process. While the United States need not

comply with Federal Rule of Civil Procedure 23 when seeking to enforce Section

707,[15] Congress described Section 707 actions as "in the nature of class actions."

*See id.* at 327-28 (citing 118 Cong. Rec. 4080 (1972)); *see also City of Miami II*, 664

F.2d at 441 (explaining that when presented with a proposed consent decree in a

Title VII action brought by the United States, "the court's duty is akin, but not

identical to its responsibility in approving settlements of class actions . . . ."). Like

Rule 23 class actions, the Parties' proposed resolution process includes a multi-step

process to remedy the alleged violation, including two fairness hearings modeled

after those used in Rule 23 class actions. *See United States v. City of Hialeah*, 899

F. Supp. 603, 607 n.1 (S.D. Fla. 1994) ("The concept of a 'fairness hearing' arises

from Fed. R. Civ. P. 23(e), which requires court approval of class-action settlements,

and has since been carried over into the realm of Title VII cases."), *aff'd*, 140 F.3d

968 (11th Cir. 1998). The Decree provides for a second fairness hearing so this Court

can consider any objections and ensure that the individual relief awards are fair,

equitable, and free of error. ECF No. 5-3 ¶ 45.

### 3. The Court has a necessary and proper role in approving the relief in the Decree.

Section 707(a) of Title VII explicitly authorizes the Attorney General to bring

---

[15] *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 327 & n.9 (1980); *United States v. City & Cty. of Denver*, 927 F. Supp. 1396, 1401 (D. Colo. 1996) (citing *Gen. Tel. Co.* as making clear that "where the Department of Justice files a pattern or practice suit . . . the enforcement suit need not comply with the requirements of Rule 23").

a civil action "requesting such relief, including an application for a permanent or temporary injunction . . . as he deems necessary to insure the full enjoyment of the rights" protected by Title VII. 42 U.S.C. § 2000e-6(a). The twin goals of Title VII are: (1) eliminating discriminatory employment practices and (2) making persons whole for injuries suffered because of such practices. *See, e.g.*, *Franks v. Bowman Transp. Co*., 424 U.S. 747, 763 (1976). Thus, courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19 (1975) (citing *Louisiana v. United States*, 380 U.S. 145, 154 (1965)). As the Eleventh Circuit has explained, if an employer violates Title VII, "the court should enjoin the employer from continuing the use of the challenged practice" and provide individual relief to those harmed by the offending practice. *In re Emp't Discrim. Litig. Against State of Ala.*, 198 F.3d 1305, 1315-16 (11th Cir. 1999). That is precisely what this Decree seeks to do.

The United States' standing and the Court's jurisdiction are not undermined by the Parties' pre-suit agreement to settle this case on the condition that this Court enter a consent decree and oversee its implementation. Nor is the United States' standing undercut by the County's cessation—for now—of the two practices challenged as discriminatory. The United States seeks retrospective relief to make the victims of the County's prior discriminatory practices whole, and it also seeks

18

prospective relief that would bar like discrimination in the future—relief that is
necessary because the County has not admitted its practices are unlawful or
disavowed them.

> a. *A controversy exists here even though the Parties reached an*
> *agreement to seek a consent decree before the complaint was filed.*

The simultaneous filing of the Complaint and the Decree does not evidence a
"friendly" suit that defeats this Court's jurisdiction for lack of a controversy. Courts
have roundly rejected the argument that "no controversy exist[s] because the parties
arrived in court with the proposed judgment in hand." *SEC v. Randolph*, 736 F.2d
525, 528 (9th Cir. 1984); *In re Asbestos Litig.*, 90 F.3d 963, 988 (5th Cir. 1996)
(finding that filing of complaint and settlement agreement on the same day "does not
change the adversarial nature of the disputes which the settlement resolves"),
vacated on other grounds by *Ortiz v. Fibreboard Corp.*, 521 U.S. 1114 (1997);
*Carlough v. Amchem Prods., Inc.*, 834 F. Supp. 1437, 1462-1466 (E.D. Pa. 1993)
(rejecting argument no controversy existed where complaint and settlement
agreement were filed simultaneously because proposed settlement was contingent
upon court approval and sought prospective relief), *cited with approval by* 10 F.3d
189, 201 (3d. Cir. 1993).[16] And, as discussed, the Eleventh Circuit and district courts

---

[16] Although some of these decisions involve class action settlements under Rule 23,
their reasoning applies equally to proposed consent decrees resolving pattern or
practice claims under 42 U.S.C. § 2000e-6(a), as the Court's role in reviewing such
decrees is substantially similar. *See* discussion *supra* Section II.A.2.b.

within it have routinely approved consent decrees in such circumstances. *See supra* note 12 and accompanying text (citing cases).

As courts have long recognized, the circumstances matter, and they must "look[] to the nature of the controversy, not the timing of the settlement . . . ." *Carlough*, 834 F. Supp. at 1465. The Decree in this case results from over a year of complex, arm's-length negotiations between two governmental parties represented by experienced counsel with substantial information about the strengths and weaknesses of each side's case. *See* Section I.C, *supra*. Significantly, Defendant disclaims any liability, ECF No. 5-3 at 2, while the United States maintains that Defendant did in fact discriminate against former applicants. Indeed, when asked by the Court, Defendant's counsel confirmed that this is "a settlement of a contested case." Hr'g Tr., ECF No. 9 at 35:7-12.

A controversy also continues to exist because the proposed consent decree is contingent on the Court's approval. *See supra* note 4 (noting the County has taken the position that the Decree only becomes effective upon Court approval). The contingent nature of an agreement subject to court approval underscores that a controversy remains, despite the Parties' agreement on the terms to resolve it. *See, e.g.*, *SEC v. Randolph*, 736 F.2d at 528 (argument the court lacked jurisdiction "neglects the contingent nature of the proposed decree").

Indeed, Defendant has yet to effectuate the relief provided by the Decree, and

it is obligated to do so only upon entry of the Decree. The Parties contemplate implementing the make-whole relief over time through a court-supervised notice and claims process that provides for objectors to be heard at a fairness hearing. Moreover, the injunction barring the County from reinstituting the challenged practices will only become effective upon entry of the Decree. These circumstances make clear that this case presents real-world consequences sufficient to maintain standing. *See Swift & Co. v. United States*, 276 U.S. 311, 326 (1928) (rejecting argument there was no case or controversy when consent decree was filed with the complaint because an injunction may issue to prevent future wrongs); *Seila Law LLC v. CFPB*, 591 U.S. 197, 212 (2020) (rejecting argument the parties lacked "adverseness" because they agreed on the merits of the underlying claim, since the court's decision would have "real-world consequences").

    b. *The relief in the Decree is necessary to remedy ongoing harm and bar like discrimination in the future.*

  That the County discontinued some of the challenged practices in the course of the investigation, but before the Complaint was filed in district court, does not diminish the United States' ability to seek the relief in the Decree or the Court's power to grant it. This holds true even if the County had discontinued all of the challenged practices during the investigation and before the Complaint was filed.

    i. The relief in the Decree is necessary to remedy ongoing harm.

  Regardless of whether the employment practices challenged in the Complaint

21

have ceased, the United States has standing to seek make-whole relief to remedy the harms from these practices. As discussed *infra* in Section II.B.2.c, the back pay, priority hiring, and retroactive seniority terms in the Decree are key components of "make-whole" remedial relief to which individuals harmed by discriminatory practices are presumptively entitled. Even if the conduct that caused the harm has ceased, the injury is ongoing because it remains unremedied. *See, e.g.*, *NAACP v. City of Evergreen, Ala.*, 693 F.2d 1367, 1370 (11th Cir. 1982) ("[E]ven absent the threat of future discriminatory behavior, the courts have a duty to correct and eliminate the present effects of past discrimination."). And there is ongoing harm here because the 202 potential claimants discriminatorily disqualified by the challenged practices have not been made whole, and part of making them whole is providing them a new opportunity to compete for a CCFD firefighter position. The priority hiring process for them to do so will only go into effect upon approval of the Decree.

> ii.  The relief in the Decree is warranted to bar like discrimination in the future.

As for injunctive relief prohibiting rank-order use of the ACCUPLACER and the credit check, the Decree seeks to bar the very hiring practices the United States identified as discriminatory during its investigation and challenged in the Complaint, and that have caused unremedied harm—practices the Defendant does not concede are discriminatory and could resume at any time in the absence of a consent decree.

*See Albemarle Paper*, 422 U.S. at 435-36 (agreeing with appellate court that district court erred in refusing to enjoin use of pre-employment tests); *In re Emp't Discrim. Litig.*, 198 F.3d at 1315-16 (to remedy Title VII violations, courts should enjoin the use of the challenged practice). Although Defendant represents that it no longer uses scores on the ACCUPLACER to rank-order candidates and no longer considers applicants' credit history, it stopped using these practices only *after* the United States opened its investigation. And while the County has not disqualified an applicant based on their credit history since 2020, it continued to obtain credit histories for applicants for years after that and continues to argue that excluding a firefighter applicant based on their credit history is justified despite agreeing to stop doing so. Am. Consent Decree, ECF No. 5-3 ¶ 26; Hr'g Tr., ECF No. 9 at 5:1-8. The County also continues to use the same written test and obtain scores that could be used to rank-order applicants; thus it has the means available to re-engage in the practices that were found to have a discriminatory impact, should the Court not prohibit it from doing so.

It is through the Decree, which is subject to Court approval, that the County will be bound to entirely cease collecting and considering credit histories and refrain from using ACCUPLACER scores to rank-order applicants. Simply put, the Decree, if approved by this Court, would prevent the County from using the practices challenged in the United States' Complaint. This case thus stands in contrast to

23

*United States v. City of Tampa*, No. 8:23-CV-02934-KKM-AAS, 2024 WL 3193961 (M.D. Fla. June 21, 2024), where the proposed injunctive relief was not directly connected to the discriminatory policy challenged in the complaint.[17]

It certainly happens that while being investigated by the United States, with the specter of a lawsuit looming, the target of that investigation ceases the challenged conduct, either to attempt to persuade the United States that a lawsuit is unnecessary, to mitigate its legal exposure, or as part of a negotiated settlement. *See, e.g.*, *SEC v. Randolph*, 736 F.2d at 528 (reversing district court's refusal to approve a consent decree where the defendants had agreed to cease engaging in insider trading and disgorge profits from this trading before complaint was filed along with consent

---

[17] *City of Tampa* is the only case the United States knows of where prospective injunctive relief (as opposed to remedial make-whole relief) was not approved in a consent decree resolving a Title VII pattern or practice case brought by the Attorney General under Section 707(a). There, the United States challenged a discriminatory parental leave policy. 2024 WL 3193961. Tampa stipulated that the challenged policy had been applied in a discriminatory manner, and it had stopped using the discriminatory policy years before the lawsuit was filed, replacing it with a different policy that was not challenged in the lawsuit. Unlike this case, the proposed decree in *City of Tampa* did not bar the city from re-instituting the discriminatory policy, as it had already been replaced. Instead, the decree concerned the adoption and implementation of a new policy (sought by Tampa) which was sufficiently similar to the challenged policy that the United States believed that monitoring the new policy for a period of time was necessary. *Id.* at *3. The court found the yet-to-be-implemented policy did not pose a sufficient risk of future discrimination justifying an injunction with court oversight. *Id*. at *6. Additionally, the court cited Tampa's stipulation as to the discriminatory application of its previous policy as further support there was no imminent threat of recurring harm. *Id.* at *2, *6. Defendant has made no such stipulation, or even acknowledgment, here.

decree); *United States v. Baltimore Cty., Md.*, No. CCB-19-2465, 2021 WL 20000480, *1-2 (D. Md. May 19, 2021) (enjoining county from using entrance exams county ceased using before complaint).

If the United States cannot obtain an injunction prohibiting employers from using discriminatory employment practices solely because it has convinced an employer to stop using them before filing suit—or solely because an employer has strategically decided on its own to temporarily cease their use to avoid such an injunction in the short run—the United States' ability to carry out its Title VII enforcement duties would be significantly compromised. The United States would be compelled to file complaints and engage in contested litigation before attempting to negotiate a resolution that would yield an injunction, thus wasting courts' and parties' resources and undermining the public interest in voluntary, efficient settlement of Title VII claims. Alternatively, the United States could pursue voluntary resolutions after identifying a Title VII violation, but those resolutions would lack the transparency, notice to interested parties, and finality that a court brings to the consideration and entry of a consent decree proposed by the United States and a public employer to resolve a discriminatory pattern or practice. *See* 42 U.S.C. § 2000e-2(n). Both options are contrary to the design of Title VII, the United States' obligation to effectively enforce it, and the public interest.

B. **The Relief in the Consent Decree Is Lawful and Should Be Approved**

1. **The Decree is entitled to a presumption of validity.**

A consent decree between two governmental entities is "entitled to a presumption of validity" that is overcome only if it is "unconstitutional, unlawful, contrary to public policy, or unreasonable." *United States v. City of Miami, Fla.*, 614 F.2d 1322, 1333 (5th Cir. 1980) ("*City of Miami I*") (internal citation omitted); *see also Stovall*, 117 F.3d at 1240.[18] If a decree affects third parties, a court "must be satisfied that the effect on them is neither unreasonable nor proscribed." *City of Miami II*, 664 F.2d at 440. The presumption of validity does not mean a court should "merely sign on the line provided by the parties." *Id*. But it means that "[a] refusal to sign a consent decree based on generalized notions of unfairness is unacceptable" and the district court "must state specific reasons why a proposed consent decree unduly burdens one class or another." *City of Miami I*, 614 F.2d at 1333.

---

[18] The Eleventh Circuit has stated alternatively that a consent decree must be fair, reasonable, and lawful. *See Stovall*, 117 F.3d at 1240, 1244 (stating that the district court must evaluate whether the decree is "fair, reasonable, and lawful" and that it must not be "unconstitutional, unlawful, unreasonable, or contrary to public policy"); *see also Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (evaluating whether class action settlement was fair, adequate, reasonable, and not the product of collusion). The Parties previously evaluated the Decree under the fair, adequate, and reasonable standard. *See* Mot. For Provisional Entry, ECF No. 2-1; Mot. For Final Approval, ECF No. 5-1. Because the Court raised issues as to the Decree's constitutionality, the United States addresses the unconstitutional, unlawful, unreasonable, or contrary to public policy standard here. The Decree meets both standards.

Where, as here, "the consent decree was submitted for approval at the same time the complaint was filed, the reasonableness and appropriateness of the consent decree must be measured against the allegations of the complaint and the relief which might have been granted if the case had gone to trial." *City of Alexandria*, 614 F.2d at 1364 (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). If a district court cannot make a determination without additional information, it can hold hearings (as contemplated by the Decree) or obtain more information, as this Court did in requesting this briefing. *See City of Miami I*, 614 F.2d at 1333. But in evaluating the terms of the Parties' compromise, "the trial judge ought not try the case in the settlement hearings." *Cotton*, 559 F.2d at 1330 ("It cannot be overemphasized that neither the trial court in approving the settlement nor this Court in reviewing that approval have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute."). Requiring the equivalent of a trial before deciding whether to approve a consent decree "would be entirely contrary to the goals of Title VII" in that "the progress of remedying illegal discrimination [would be] likely to slow to a snail's pace." *City of Miami I*, 614 F.2d at 1334. The Decree easily meets the standard for approval in this Circuit.

### 2. The Decree represents a reasonable factual and legal determination of the United States' allegations.

When the claim underlying a consent decree "seeks to enforce a statute, the

decree must be consistent with the public objectives sought to be attained by Congress." *City of Miami II*, 664 F.2d at 441. This assessment requires reviewing the United States' claim against Title VII principles. *Id.*; *City of Alexandria*, 614 F.2d at 1364. Doing so confirms that the Decree is a reasonable and appropriate resolution of the Complaint's allegations consistent with the purposes of Title VII.

Congress enacted Title VII "to assure equality of employment opportunities by eliminating those practices and devices that discriminate on the basis of race, color, religion, sex, or national origin." *Gardner-Denver*, 415 U.S. at 44. The United States' Complaint alleges that Defendant has engaged in a pattern or practice of disparate impact discrimination against African-American candidates for firefighter positions. Compl., ECF No. 1 ¶ 1. A plaintiff can establish a Title VII violation by "demonstrat[ing] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race . . . and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). In evaluating a Title VII consent decree, it is thus appropriate for the Court to consider "the provisions of the consent decree as if the plaintiff had put on a case consisting solely of the uncontroverted statistics in the complaint and other documents before it, and the defendants had rested without putting on any rebuttal evidence . . . ." *City of Alexandria*, 614 F.2d at 1365. As discussed below, the statistical disparity alleged in

the Complaint, and supported by Dr. Siskin's expert declaration, satisfies the standard recognized by the Supreme Court and the Eleventh Circuit for establishing a prima facie disparate impact case and justifies the agreed-to relief.

### a. The United States can establish a prima facie case of discrimination.

To establish a prima facie disparate impact discrimination case based on race, a plaintiff must show that a specific, facially neutral employment practice has a statistically significant adverse impact on members of a particular racial group. *See Albemarle Paper*, 422 U.S. at 425; *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274-75 (11th Cir. 2000). The United States alleges that two specific employment practices used by CCFD to screen firefighter candidates had a statistically significant disparate impact on African-American candidates—(1) the rank-order use of the ACCUPLACER; and (2) the pass/fail use of the credit check. *See* Compl., ECF No. 1 ¶¶ 23-24, 30. Disparities equivalent to more than two to three units of standard deviation establish a prima facie case of disparate impact discrimination. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.14, 311 (1977); *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977); *Peightal v. Metro. Dade Cty.*, 26 F.3d 1545, 1556 (11th Cir. 1994).

Dr. Siskin's statistical analysis shows the disparity exceeds this standard and establishes a prima facie case of discrimination. For CCFD's rank-order use of the ACCUPLACER in 2020, the disparity between both the effective passing rates and

the average rank on the eligibility list of White and African-American candidates is statistically significant at 7.5 and 8.64 units of standard deviation, respectively.[19] *See* Ex. B, Siskin Decl. ¶¶ 11-12. For the credit check, the disparity in pass rates between White and African-American candidates between 2016 and 2020 measured 6.29 units of standard deviation. *See id.* ¶ 15. These showings far exceed the 2 to 3 units of standard deviation necessary to establish a prima facie case. In *Nash v. Consolidated City of Jacksonville, Duval County, Florida*, 905 F.2d 355, 358 (11th Cir. 1990), the Eleventh Circuit affirmed the district court's conclusion that a statistically significant disparity between the rate at which African-American and White firefighters passed a promotional exam established a prima facie case of disparate impact discrimination. The same conclusion is warranted here.

> b. *The significant statistical disparity established by the United States justifies approving the Decree.*

If the Parties were litigating this case, the burden would shift to Defendant to show either that the United States' statistical analysis is wrong or that the credit

---

[19] When eligible candidates are placed in rank-order based on test scores, courts have accepted analyses showing statistically significant disparities in effective pass rates as sufficient to establish a prima facie case of disparate impact discrimination. *See, e.g.*, *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1377 (2d Cir. 1991); *Moore v. Napolitano*, 926 F. Supp. 2d 8, 21 (D.D.C. 2013); *United States v. City of N.Y.*, 637 F. Supp. 2d 77, 91-93 (E.D.N.Y. 2009); *cf. Ensley Branch of NAACP v. Seibels*, 616 F.2d 812, 822 (5th Cir. 1980) (holding that using test scores to rank firefighter applicants "is justified only if there is evidence showing that those with a higher test score do better on the job than those with a lower test score" and finding such evidence "utterly lacking").

check and the rank-order use of the ACCUPLACER were job related and consistent with business necessity. 42 U.S.C. §§ 2000e-2(k)(1)(A)(i), 2000e-2(k)(1)(B)(ii); *In re Emp't Discrim. Litig.*, 198 F.3d at 1314-15. If during litigation a defendant chose to present no evidence in response to a prima facie case of disparate impact, the court would be "obligated to enter a decree against the defendants." *City of Alexandria*, 614 F.2d at 1364; *see also Howard v. McLucas*, 671 F. Supp. 756, 761 (M.D. Ga. 1987), *aff'd*, 871 F.2d 1000 (11th Cir. 1989) ("[A] statistical showing of adverse impact creates a presumption of Title VII discrimination, which, if not rebutted by any showing that the contested practice was job-related, requires the court to enter a decree finding unlawful discrimination"); *Kirkland v. N.Y. State Dep't of Corr. Servs.*, 711 F.2d 1117, 1129 (2d Cir. 1983) (explaining a judicial determination that an employment practice is not job-related is not required before a settlement can be approved).[20] Because a court reviewing a consent decree should consider the facts as if "the defendants had rested without putting on any rebuttal evidence," *City of*

---

[20] *City of Hialeah* is not to the contrary. There, the Eleventh Circuit held that a *contested* prima facie case is not sufficient to justify dispensing with a nonconsenting *party's* right to a full adjudication on the merits. 140 F.3d at 976. The district court had entered a consent order after refusing to allow a party to that case to present evidence that the party claimed would contradict the United States' prima facie case. *Id.* The Eleventh Circuit held that where a consent decree affects the contractual rights of a nonconsenting party to the litigation, it cannot be entered over the objection of that party without a finding of liability after a trial on the merits. *Id.* at 977 (citing *City of Miami II*, 664 F.2d at 436). Those circumstances are not present here. As discussed further below, no contractual rights are at issue and no party objects to entry of the Decree.

*Alexandria*, 614 F.2d at 1365, this Court should enter the requested consent decree. 614 F.2d at 1365.

That the County disclaims having violated the law is of no matter. Controlling precedent recognizes that disclaimers are standard in Title VII consent decrees and that it is appropriate to understand such a disclaimer as "an admission that there is a statistical disparity which the defendants cannot unequivocally explain, together with a reservation of the right to attempt to explain it at any other time." *City of Alexandria*, 614 F.2d at 1365 n.15 (reversing the district court's initial refusal to enter the decree because the defendant declined to admit to unlawful discrimination and ordering the decree to be entered); *see also Howard*, 871 F.2d at 1007-08; *Kirkland*, 711 F.2d at 1131 n.16.

Even if Defendant could establish that the challenged practices are job related and consistent with business necessity, the United States could still prevail by showing that alternative employment practices would serve Defendant's legitimate interests but with less disparate impact. 42 U.S.C. § 2000e-2(k)(1)(A)(ii); *Albemarle Paper*, 422 U.S. at 425. Since 2021, CCFD has used a randomizer to select the order in which candidates who pass the ACCUPLACER and the physical agility test are selected to move forward in the hiring process. CCFD also has not disqualified any candidates based on the credit check since 2020. It is reasonable to presume that the CCFD firefighters hired during this time are fully qualified. Both are alternative

employment practices that have eliminated the adverse impact on African-American candidates while serving CCFD's legitimate business needs. *See* Ex. B, Siskin Decl. ¶ 14 (no adverse impact after CCFD implemented randomizer).

       *c.   The relief in the Decree is reasonable and consistent with Title VII.*

The relief the United States seeks for qualified individual claimants eliminated by the County's discriminatory hiring practices is both reasonable and consistent with Title VII and public policy. A central purpose of Title VII is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper*, 422 U.S. at 418; *see also United States v. City of Miami*, 195 F.3d 1292, 1297 n.3 (11th Cir. 1999) ("*City of Miami III*") ("In the Title VII context, we have unambiguously held that 'make-whole' relief is intended to recreate the employment conditions that would have existed absent an employer's discrimination—i.e., to place 'the injured party in the position he or she would have been in absent the discriminatory actions.'") (quoting *Walters v. City of Atlanta*, 803 F.2d 1135, 1145 (1986)). The Supreme Court has held that back pay, a job offer, and retroactive seniority are essential components of make-whole relief to which victims of discrimination are presumptively entitled. *See Franks*, 424 U.S. at 777; *Albemarle Paper*, 422 U.S. at 421. That relief is precisely what the Decree provides.

The Parties' approach to identifying those entitled to this relief and distributing the relief on a class-wide basis is consistent with the approach the

Eleventh Circuit has endorsed in similar circumstances. The Parties appropriately defined the individuals eligible for relief as the 202 African-American candidates disqualified solely by the challenged practices during the relevant period. *See City of Miami III*, 195 F.3d at 1297 n.3 (instructing the district court to provide make-whole relief to 35 specific officers qualified for promotion but passed over because of discriminatory practice). The United States does not contend that CCFD would have hired all 202 of these candidates. Instead, based on Dr. Siskin's hiring shortfall analysis, the Parties reached a compromise of 16 priority hire positions, which is no more than could reasonably be expected to have been hired absent the discrimination. As courts have acknowledged, it is impossible in these circumstances to know for certain *which* of the 202 candidates would have been hired for these 16 positions. *See, e.g.*, *City of Miami III*, 195 F.3d at 1299 (acknowledging "no *ex post* method of fashioning remedial relief can ever truly recreate the past"). So it is appropriate to fashion relief based on the hiring shortfall of 16 and allocate it on a pro rata basis among the class of eligible claimants. *See, e.g.*, *id.* at 1294 (finding district court "should have divided the monetary value of the two promotions on a pro rata basis amongst the class of eligible candidates"). That is what the Parties have agreed to do.

The 202 potential claimants will be able to compete for one of the 16 priority hire positions with limited retroactive seniority, through the same hiring process that

all applicants complete, and to submit a claim for a pro rata share of the settlement fund. As discussed next, this make-whole relief to the specific individuals disqualified by the challenged practices does not have an unreasonable effect on third parties and is constitutional.

### d. The effect of the Decree on third parties is neither unreasonable nor proscribed.

If a consent decree affects third parties, "the court must be satisfied that the effect on them is neither unreasonable nor proscribed." *City of Miami II*, 664 F.2d at 441. The proposed remedy in this case may affect the interests of incumbent firefighters in very limited circumstances in terms of layoffs or RIFs. Indeed, that is exactly why the Decree provides for robust notice, an opportunity to object to the Decree, and a fairness hearing in which the Court could consider any objections. With the notice ordered by this Court when it provisionally approved the Decree on May 15, 2024, the significant media attention on this case, and the substantial time to submit an objection form, incumbent firefighters had ample opportunity to consider whether their rights would be affected by the Decree. Yet none submitted objections or appeared at the fairness hearing to oppose the Decree. This underscores that the effect on incumbent firefighters is not a proper basis to refuse approval of the Decree.

The potential effect on incumbent firefighters is exceedingly minimal and unlikely to occur. Only one provision of the Decree involves "competitive" seniority

that might affect the interests of incumbent firefighters:[21] for claimants who successfully compete for a position and accept an offer of hire, CCFD will use the date that they would have started the training academy if not disqualified by one of the challenged practices for determining the order for layoffs/RIFs and the order of recall from layoffs/RIFs. Am. Consent Decree, ECF No. 5-3 ¶ 13. Thus, while a layoff or RIF is unlikely because CCFD is understaffed, Hr'g Tr., ECF No. 9 at 20:5-9, if CCFD implements layoffs or a RIF, some employees might be laid off before, and brought back from layoff after, a priority hire who would have been hired before that employee absent discrimination.

The Supreme Court has held that this type of effect on third-party interests is permissible when necessary to remedy a violation of Title VII. *Franks*, 424 U.S. at 774. Indeed, the Supreme Court has explained,

---

[21] Two types of benefits are determined based on an employee's seniority—benefit seniority and competitive seniority. Benefit seniority determines benefits such as accrual of vacation time, pay rates, and pension benefits. *City of Hialeah*, 140 F.3d at 972. "'Competitive seniority' determines the allocation of benefits for which employees must compete with one another, such as shift assignments, promotions, and transfers." *Id.* Backpay, a priority hire position, and benefit seniority do not affect incumbent employees. *See, e.g.*, *id.*; *Franks*, 424 U.S. at 773 n.33 (noting that the argument that awarding retroactive seniority to victims of discrimination will conflict with the economic interests of incumbent employees "has no application to a retroactive award for purposes of 'benefit' seniority" such as pay and accrual of leave). In fact, the Supreme Court has described benefit seniority as "analogous, if not identical, to the decision concerning an award of backpay to an individual discriminatee hired pursuant to an order redressing previous employment discrimination." *Franks*, 424 U.S. at 773 n.33.

in exercising their equitable powers, district courts should take as their starting point the presumption in favor of rightful-place seniority relief, and proceed with further legal analysis from that point; and that such relief may not be denied on the abstract basis of adverse impact upon interests of other employees but rather only on the basis of *unusual adverse impact* arising from facts and circumstances *that would not be generally found in Title VII cases*.

*Id.* at 779 n. 41 (emphasis added). "Unusual adverse impact" is not present here as bolstered by the lack of any objections from incumbent employees. Seniority for order of layoff and recall is precisely the type of make-whole relief "generally found in Title VII cases," *id.* at 767-68, and its impact here would be minimal given only up to 16 firefighters will receive such retroactive seniority on a force of over 700 firefighters.

To the United States' knowledge, the Eleventh Circuit has withheld approval for competitive retroactive seniority benefits only in cases with facts that are not present here, where incumbent employees were represented by a union that was a party to the lawsuit and objected because such benefits would affect the legal, contractual rights created by the employees' collective bargaining agreement ("CBA"). *See, e.g.*, *City of Hialeah*, 140 F.3d at 971; *City of Miami II*, 664 F.2d at 447. In *City of Hialeah*, the district court approved the portions of the decree that provided for priority hire positions and retroactive benefit seniority, *see* 899 F. Supp. at 607, 610, and these portions of the decree were neither subject to objections nor appeal. 140 F.3d at 973. However, the court denied approval of the part of the consent decree that awarded retroactive *competitive* seniority (and the Eleventh

Circuit affirmed this denial) because these seniority benefits were not merely employee expectations but were "legally enforceable rights guaranteed to them by their collective bargaining agreements." *City of Hialeah*, 140 F.3d at 971. The Eleventh Circuit found that approval of that part of the proposed decree over the objections of the union—which was a party to the lawsuit—would violate the incumbent employees' collective bargaining rights under Florida law. *Id.* at 983.

CCFD firefighters are not represented by a union and do not have a CBA, so these circumstances are not present here. Under Georgia law, "[s]eniority arises only out of contract or statute. An employee has 'no inherent right to seniority in service.'" *Lamon v. Ga. S. & Fla. Ry. Co.*, 90 S.E.2d 658 (Ga. 1955). The United States identified no Georgia statute that creates a legal entitlement to seniority benefits here. So any expectations incumbent employees may have about their seniority benefits are just that—expectations that can be permissibly modified, not rights. *See City of Hialeah*, 899 F. Supp. at 612 (explaining that the problem with the competitive retroactive seniority there arose "not so much from the fact that the incumbent employees are 'unhappy' with the proposed settlement because their 'expectations' will not be realized, but more from the fact that their vested, contractual rights will be diminished") (quoting *Peightal*, 26 F.3d at 1561).

During the fairness hearing, this Court also expressed concern for "better qualified" future applicants who may not be selected because a position is offered to

a potential claimant who qualifies for an offer of hire instead. Hr'g Tr., ECF No. 9 at 31:13-16. That a future job applicant has some greater interest in or right to a position than former candidates who already passed the initial hiring screens and were placed on an eligibility list is not only speculative, but unfounded. *Sims v. Montgomery Cty. Comm'n*, 890 F. Supp. 1520, 1534 (M.D. Ala. 1995) (rejecting a similar concern as too speculative to justify withholding approval of consent decree and noting that "[t]his court does not sit as a roving court of equity positioned to remedy all imaginable legal flaws in the plan"). Considering the Supreme Court's recognition in *Franks* that incumbent employees may appropriately bear some burden due to implementation of make-whole relief, it follows even more strongly that applicants for employment also may appropriately bear some burden. *See In re Birmingham Reverse Discrim. Emp't Litig.*, 20 F.3d 1525, 1543 (11th Cir. 1994) (contrasting the effect of the race-based promotional quota system the court found unlawful there with relief awarded in a hiring case where the impact is minimized as it is spread across society as a whole).

### 3. The Decree is not unconstitutional, unlawful, or against public policy.

During the August 26, 2024 hearing, the Court raised concerns about whether requiring CCFD to hire up to 16 of the former candidates unlawfully disqualified by the challenged hiring screens, with retroactive seniority, is a lawful remedy in light of recent Supreme Court and Eleventh Circuit decisions prohibiting the

consideration of race in the provision of certain benefits. Neither *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023) ("*SFFA*"), nor *American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765 (11th Cir. 2024), altered long-standing precedent that providing make-whole relief under Title VII to identified victims of discrimination—as the proposed Decree does—is neither a racial classification nor impermissible. Indeed, *SFFA* re-affirmed the well-established distinction between make-whole remedies granted to identified victims of discrimination and race-based affirmative action.

### a. The Decree does not involve classifications based on race.

The Decree does not rely on race-based classifications triggering strict judicial scrutiny under equal protection principles, nor does it institute quotas. In deciding the appropriateness of relief under Title VII, the Supreme Court has long distinguished between make-whole relief under Title VII and affirmative measures that provide a preference based on race to individuals who are not identified victims of discrimination. *See, e.g.*, *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 448-49 (1986) (distinguishing between "make-whole relief" and affirmative remedies such as requiring employers "to hire and to admit qualified minorities roughly in proportion to the number of qualified minorities in the work force"); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 374 n.61 (1977) ("To allow identifiable victims of unlawful discrimination to participate in a layoff recall

40

is not the kind of 'preference' prohibited by § 703(j). If a discriminatee is ultimately allowed to secure a position before a laid-off line driver . . . he will do so because of the bidding power inherent in his rightful-place seniority, and not because of a preference based on race.").

The Supreme Court upheld this distinction just last year in *SFFA*. There, the Court held that Harvard's and UNC's consideration of race in undergraduate admissions for the purpose of obtaining the educational benefits that flow from a racially diverse student body triggered strict scrutiny and violated Title VI and the Equal Protection Clause of the Fourteenth Amendment, respectively. 600 U.S. at 214. In doing so, Justice Thomas clarified that "[e]ven today, nothing prevents the States from according an admissions preference to identified victims of discrimination." *Id.* at 249 (Thomas, J., concurring). This is so because the Court's "precedents have repeatedly and soundly distinguished between programs designed to compensate victims of past governmental discrimination from so-called benign race-conscious measures, such as affirmative action." *Id.* at 260 (citing *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 504-05 (1989); *Adarand Constr., Inc. v. Pena*, 515 U.S. 200, 226-27 (1995)). The type of relief Justice Thomas distinguished from *SFFA*'s holding—relief provided to identified victims of past governmental discrimination—is precisely what the Decree provides.

In the Supreme Court's landmark opinion in *Croson*, it held that all race-based

governmental classifications must satisfy strict scrutiny to comply with the Equal Protection Clause. 488 U.S. 469, 492-93 (plurality opinion). In his concurrence, Justice Scalia aptly explained the distinction between race-based action, which was subject to the Court's holding, and remedial relief to identified victims of discrimination, which was not, and he emphasized that the latter is not based on race. Thus, Justice Scalia stated that "[n]othing prevents" a state government from according a preference to "identified victims of discrimination" because "[w]hile most of the beneficiaries might be black, neither the beneficiaries nor those disadvantaged by the preference would be identified *on the basis of their race*." *Croson*, 488 U.S. at 526 (Scalia, J., concurring) (emphasis in original). Indeed, Justice Scalia described remedies directed to identified victims of discrimination, such as those provided in the Decree, as "race-neutral remediation." *Id.*[22]

If the Parties' intention was to simply increase the representation of African Americans in CCFD's firefighter ranks, then they would have agreed that the 16 priority hire spots could be filled by any qualified African-American individuals.

---

[22] The United States is aware of only one case in which a district court in the Eleventh Circuit found that strict scrutiny applied to remedial relief to identified victims of discrimination under Title VII. In *City of Hialeah*, the district court applied strict scrutiny (albeit without using that term) to the proposed victim-specific relief. 899 F. Supp. at 608. Notably, the court did not address authority distinguishing make-whole relief to identified victims of discrimination from race-based affirmative relief to members of a racial group. Nevertheless, it took little analysis for the court to determine the decree met the strict scrutiny standard "without question." *Id.* at 609. This determination was not appealed. 140 F.3d at 973.

But that is not what this Decree does. Instead, only identified victims of discrimination are entitled to the relief in the Decree, as discussed next. Thus, strict scrutiny does not apply.

> ### b. The Decree provides for relief only to identified victims of discrimination.

The Parties took steps to ensure that only identified victims of the challenged hiring practices are entitled to relief under the Decree. First, the Parties identified 213 specific African-American candidates disqualified by the challenged employment practices. *See* Ex. B, Siskin Decl. ¶ 17. This group consisted of African-American candidates who (1) passed the ACCUPLACER in 2020 but scored too low to be processed further in the hiring process due to CCFD's rank-ordering or (2) failed the credit check from 2016 to 2020. *See id.* Defendant then identified candidates within this group who would have been eliminated by another step in the hiring process, and the Parties removed these individuals from the list of potential claimants. That left 202 African-American candidates—the group identified by the Parties as having been disqualified solely by the challenged hiring screens. These individuals are entitled to relief not because of their race, but because they were subjected to practices that prevented them from having a fair chance to compete for a job for which they were otherwise qualified.

Further, the Decree anticipates that relief will be awarded through a Court-supervised notice and claims process in which the United States will make initial

eligibility determinations, Defendant can object, and the Court will ultimately approve the relief afforded each claimant after a public fairness hearing on the individual relief. Am. Consent Decree, ECF No. 5-3 ¶¶ 50-52. These procedures help ensure that only those individuals harmed by the discriminatory practices will be entitled to relief. As discussed *supra* in Section II.B.2.b, the relief in the Decree is make-whole relief to identified victims of discrimination, even without a finding of liability. Indeed, the Eleventh Circuit has recognized individuals harmed by allegedly discriminatory practices as identified victims of discrimination based on the equivalent of a prima facie case of disparate impact discrimination. *See, e.g.*, *Howard*, 871 F.2d at 1004, 1007, 1008-09 (approving promotional relief to "actual victims of discrimination" based on unrebutted prima facie showing of disparate impact discrimination through statistical evidence); *In re Birmingham*, 20 F.3d at 1547 (finding decree's use of race-based quota impermissible and noting there was "absolutely no similarity" between that decree and the decree approved by the Eleventh Circuit in *Howard*, which was "intended to provide specific relief to victims of past discrimination").

Since the Decree provides relief to identified victims of discrimination and does not involve preferences based on a racial classification, strict scrutiny does not apply. Regardless, at any level of scrutiny—even strict scrutiny—the relief here would be appropriate because it is narrowly tailored to remedy the discrimination at

issue in this case. *See Croson*, 488 U.S. at 507; *Howard*, 871 F.2d at 1008-10.[23] Specifically, the relief is necessary to provide make-whole relief to the specific candidates discriminatorily disqualified by the challenged practices, it is tailored to the number of hires expected absent the use of such practices, it has minimal effects on third parties, and it will end as soon as CCFD fills the 16 priority hire positions or satisfies the waiver provisions in the Decree through which CCFD can fulfill its priority hire obligations without filling all 16 positions if there are not enough interested, qualified claimants. *See Howard*, 871 F.2d at 1008-10.

> ### c. The Eleventh Circuit's recent opinion in Fearless Fund does not affect the lawfulness of the make-whole relief the Decree provides.

During the fairness hearing, the Court also asked whether the Decree is lawful in light of the Eleventh Circuit's recent decision in *Fearless Fund*, 103 F.4th at 765. It is. *Fearless Fund* concerned a venture capital fund's grant contest available only to businesses owned by Black women and not, as here, a court-ordered remedy to identified victims of an employer's discrimination. *Id.* at 769. *Fearless Fund* neither

---

[23] In *Howard v. McLucas*, the district court had approved a consent decree that provided 240 promotional opportunities for eligible class members, which the court found were, to the best extent possible, identified as victims of discrimination. 671 F. Supp. at 761-62. Nevertheless, because of a lack of certainty about which class members would have been promoted—the promotional process did not involve employees submitting applications (unlike CCFD's process here)—the court applied strict scrutiny out of an abundance of caution and found that the promotional relief satisfied strict scrutiny. *Id.* at 766-68. The Eleventh Circuit affirmed and expressly declined to hold that strict scrutiny applied. 871 F.2d at 1006.

involved nor altered the propriety of make-whole relief under Title VII to identified victims of discrimination and does not undermine the lawfulness of the Decree.

In *Fearless Fund*, the Eleventh Circuit preliminarily enjoined the grant contest, finding that an entity that wished to compete for the grants was likely to prevail on its claim that the contest violated 42 U.S.C. § 1981's prohibition against discrimination on the basis of race when making or enforcing contracts. 103 F.4th at 769. After determining that the grant contest was a "contract," the court considered whether it qualified for the remedial-program exception for certain voluntary race-conscious affirmative action plans, as developed in the Title VII context in *United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193, 208 (1979), and *Johnson v. Transportation Agency*, 480 U.S. 616 (1987), and later extended to employment discrimination cases arising under section 1981. *Id.* at 776.

The *Weber/Johnson* analysis the Court used in *Fearless Fund* is inapplicable here. That analysis applies when a court is determining when it comports with Title VII to use race-based affirmative action to eliminate a "manifest racial imbalance" in segregated job categories; it is not relevant to determining whether a court may award make-whole remedial relief to identified victims of discrimination under Title VII, as here. *See Johnson*, 480 U.S. at 628. In *Fearless Fund*, the court explained that the *Weber/Johnson* analysis considers whether a "private, race-conscious remedial program" (1) addresses "manifest racial imbalances" and (2) "doesn't

46

'unnecessarily trammel' the rights of others or 'create[] an absolute bar to' the advancement of other employees." 103 F.4th at 776 (quoting *Johnson*, 480 U.S. at 626-30). The Decree at issue here is not designed to eliminate a racial imbalance at all. It provides make-whole relief based on the number of African-American candidates it is reasonable to expect CCFD would have hired absent unlawful discrimination. Even if the Decree involved a racial classification—which it does not—it would be subject to the more stringent strict scrutiny analysis that applies to a state or local government's use of a racial classification, which, as shown above, it survives. In sum, the relief provided by the Decree is not unconstitutional nor unlawful and should be approved.

## III.   CONCLUSION

For these reasons, as well as those stated in the Joint Motion for Provisional Approval, ECF No. 2 and Joint Motion for Final Approval, ECF No. 5, the United States requests that the Court enter the Decree as final.


Date: October 25, 2024


Respectfully submitted,

For Plaintiff United States of America:

By:

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
Georgia Bar No. 375505
Deputy Chief
Public Integrity & Civil Rights Section
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181
aileen.bell.hughes@usdoj.gov

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

KAREN D. WOODARD
*Chief*
*Employment Litigation Section*

CLARE GELLER (NY Reg. No. 4087037)
*Deputy Chief*

*/s/ Juliet E. Gray*
BRIAN G. MCENTIRE (VA Bar #48552)
JULIET E. GRAY (DC Bar #985608)
*Senior Trial Attorneys*
U.S. Department of Justice
Civil Rights Division
Employment Litigation Section
150 M Street, N.E., Room 9.1802
Washington, DC 20530
Phone: (202) 598-9907
Fax: (202) 514-1005
brian.mcentire@usdoj.gov
juliet.gray@usdoj.gov

## Certificate of Compliance

I hereby certify, pursuant to Local Rule 7.1D, that the foregoing motion and brief

have been prepared using Times New Roman, 14 point font.

*/s/ Juliet E. Gray*
Juliet E. Gray