# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civ. No. 1:24-cv-02010-WMR-JEM |
| COBB COUNTY, GEORGIA, | ) ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF BERNARD R. SISKIN, PH.D.

I, BERNARD R. SISKIN, declare as follows:

1.  I am the Director of BLDS, LLC, based in Philadelphia, Pennsylvania. I specialize in the application of statistics to the analysis of employment practices. Prior to entering private practice, I was a tenured faculty member and Chairman of the Department of Statistics at Temple University in Philadelphia. I received my Ph.D. in Statistics with a minor in Economics from the Wharton School of the University of Pennsylvania in 1970. I have authored four books on statistical methodology, three book chapters, four research monographs, and numerous papers, including articles on the role of statistics in the analysis of employment discrimination issues. I have been retained by numerous private organizations and governmental entities, including but not limited to, the United States Department of

1

Justice ("DOJ"), the Equal Employment Opportunity Commission, the United States Department of Labor, the Federal Bureau of Investigation, the Central Intelligence Agency, and various state and city agencies. A copy of my resume is attached.

2. On November 2, 2021, I was retained by DOJ to provide my expert opinion during the investigation stage of this case as it relates to two selection devices used by the Cobb County Fire Department ("CCFD") in its selection process for the position of entry-level firefighter. Specifically, I have been asked to provide my expert opinion as to: (i) whether CCFD's use of the ACCUPLACER written exam ("ACCUPLACER") as a rank-order selection device in 2020 resulted in a statistically significant disparate impact upon African-American firefighter candidates; and (ii) whether CCFD's use of a credit check from 2016 to 2020 resulted in a statistically significant disparate impact against African-American firefighter candidates. I also was asked to measure the practical effect of the rank-order use of the ACCUPLACER and pass/fail use of the credit check in terms of the shortfall in African-American passers and hires caused by these two employment practices.

### CCFD's Hiring Process

3. Based on the data and information provided to me, it is my understanding that since 2016 the steps in CCFD's hiring process have been as follows: written exam, physical agility test, background check (driving history,

criminal background, and credit check), polygraph, medical exam, psychological exam, and final interview with the fire chief. Beginning in 2020, CCFD required all entry-level firefighter candidates to take the ACCUPLACER. The ACCUPLACER consists of three sections: (1) Reading; (2) Writing; and (3) Mathematics. Candidates can receive up to 300 points on each of these three sections. Firefighter candidates must achieve a passing score on each of the three sections to pass the exam (i.e., 224 out of 300 or 74.6 percent on Reading, 236 out of 300 or 78.7 percent on Writing, and 229 out of 300 or 76.4 percent on Mathematics). Candidates who did not pass the exam were eliminated from the firefighter hiring process. In 2020, CCFD also ranked all candidates who passed both the ACCUPLACER and the physical agility test by their total combined ACCUPLACER score and invited the top-ranked candidates on the eligibility list to move forward in the process towards an offer of hire and invitation to attend the fire academy. In other words, a passing score on the ACCUPLACER did not guarantee moving forward in the hiring process. Rather, a candidate had to score high enough on the ACCUPLACER to move forward. In 2020, when CCFD used the ACCUPLACER in the rank-order manner described above, no African-American candidates were selected for hire. Starting in 2021, CCFD still requited firefighter candidates to pass the ACCUPLACER to continue in its hiring process. However, instead of ranking candidates based on their ACCUPLACER total score, CCFD began using a "randomizer" (i.e., a software or

3

hardware program that sets a list of items in random order) to select candidates who pass the ACCUPLACER and physical agility test to move forward in the hiring process.

4. From at least 2016 through 2020, CCFD conducted a credit check of firefighter candidates as part of a larger background check. CCFD screened applicants' credit histories and removed applicants on this basis from continuing in the hiring process.

## Methodology for Determining Disparate Impact

5. An employer's use of an examination on a pass/fail basis is considered to have a disparate impact upon a protected class if members of the protected class have a statistically significantly lower likelihood than other test takers of passing the test. To determine whether the credit check had a disparate impact upon African Americans, I compared the pass rates of African-American firefighter candidates with the pass rates of White firefighter candidates. I use the passing rate for White firefighter candidates as the benchmark because the *Uniform Guidelines on Employee Selection Procedures* suggest that the success rate of the class of interest should be compared to that of the best performing or majority group (Whites). If there is a statistically significant difference between the pass rates of African-American and White test takers, one can conclude that the disparity is associated with race rather than chance. By ruling out chance, we can reasonably conclude that

not only did African-American firefighter candidates as a group actually have a lower likelihood of passing the test than White firefighter candidates in the test administration studied, we would also expect to observe a similar disparity between African-American and White firefighter candidates' performance on any other administration of this selection procedure.

6. Additionally, because candidates were ranked on an eligibility list in 2020 based on their ACCUPLACER score, and the eligibility list was not exhausted, I analyzed the rank-order effect of the ACCUPLACER by analyzing both the average ranks of African-American and White firefighter candidates on the eligibility list and the "effective passing" rates of African-American and White firefighter candidates on the ACCUPLACER. To "effectively pass" the ACCUPLACER, a candidate must not have only passed the exam but also achieved a score that was high enough to move forward in the hiring process. In 2020, the lowest "effective passing" score for such a candidate was 89.22 percent because this was the percentage score of the last person reached for further processing on the eligibility list. In other words, a firefighter candidate who scored below an 89.22 percent "effectively failed" the ACCUPLACER even though they nominally passed it, because their score on the ACCUPLACER eliminated them from moving forward in the hiring process regardless of how they performed on any other step in the selection process. I evaluated the statistical and practical significance of any

5

disparity in pass rates for the credit check and effective pass rates for the ACCUPLACER to determine whether the disparity was the result of chance or was instead attributable to the fact that candidates from the protected group actually had a lower likelihood of passing the selection device.

A. <u>Statistical Significance</u>

7. Statisticians, testing experts, and other social scientists normally consider a disparity to be statistically significant if the probability of the disparity occurring by chance is 5 percent or less. The 5 percent probability level is equivalent to a difference of approximately two (1.96) units of standard deviation. For purposes of this declaration, I refer to a disparity of at least 1.96 units of standard deviation as being "statistically significant." The larger the number of standard deviations, the lower the probability that the disparity occurred by chance.

B. <u>Practical Significance</u>

8. A descriptive statistical method that can assist the trier of fact in assessing the practical significance of a disparity is the shortfall in candidates from the protected group who pass the selection device at issue. Using the credit check as an example, the passing shortfall is the number of African Americans who would be expected to pass the credit check if the pass rate of African-American firefighter candidates was equal to that of White firefighter candidates. Thus, the passing shortfall gives the trier of fact information about the practical effect of the

6

disparity in terms of how many candidates from the protected group were prevented from proceeding in the selection process because of the disparate impact of the selection device at issue.

9. While I can precisely determine the shortfall in passers of the selection device at issue, it is not possible to exactly determine the number of additional candidates from the protected group who would have been hired absent the discriminatory effect of the selection device, i.e., the "hiring shortfall." This is because not everyone passing the selection device is offered a position due to candidates either failing or not completing other, subsequent steps in the process. However, as a further measure of practical effect, I can use professionally accepted methods to estimate the hiring shortfall of African-American candidates from the County's rank-order use of the ACCUPLACER and pass/fail use of the credit check. To do so, I relied on the relevant data in this case to determine the likelihood that a firefighter candidate who "effectively failed" the ACCUPLACER in 2020 or failed the credit check from 2016-2020 would have failed some other selection device if they had moved forward in the hiring process, and/or would have withdrawn and, thus, would not have received a job offer. I also assumed that the total number of positions to be filled is fixed. In other words, while we first estimate an additional number of African-Americans candidates who would pass all the steps and be eligible for hire, my analysis then adjusts this number to

account for a fixed number of hires into the relevant academy classes and assumes that CCFD would not have filled more vacancies than it actually did.

C. <u>Analysis of Data Across Time</u>

10. When the same selection device is used multiple times to screen different groups of candidates, it is a proper statistical practice to study the data over all the administrations of the selection device. Doing so increases the sample size and maximizes the accuracy of the analysis. As a result, when analyzing the credit check for the period 2016-2020, which constituted several hiring processes, I analyzed its disparate impact over all its administrations to present the most accurate estimate of the disparate impact of the credit check.

## **2020 ACCUPLACER**

11. CCFD's rank-order use of the ACCUPLACER in 2020 had a statistically and practically significant disparate impact upon African-American firefighter candidates. As a preliminary matter, most candidates passed the ACCUPLACER: 92.4 percent of African-American candidates and 97.5 percent of White candidates passed the ACCUPLACER. As discussed above, because candidates were placed on an eligibility list in rank order based on their ACCUPLACER score and many candidates with passing scores were never reached, the more relevant analysis is the difference in effective passing scores between African-American and White candidates. This analysis results in a

statistically significant disparate impact against African-American candidates. While 44.2 percent of White candidates scored at or above the passing score of 89.22 percent, only 14.5 percent of African-American candidates scored at or above this score. The disparity between the effective pass rate of African-American and White candidates is equivalent to 7.50 units of standard deviation. The probability of this statistically significant disparity occurring by chance is almost non-existent.

12. Additionally, the average rank of an African-American candidate who passed the ACCUPLACER and was placed on the eligibility list was 338.55, while the average rank of a White ACCUPLACER passer was 221.04. This disparity between average ranks is statistically significant and is equivalent to 8.64 units of standard deviation.

13. The disparity resulting from rank-order use of the ACCUPLACER is also practically significant. There is a shortfall of 74 African-American ACCUPLACER effective passers (*i.e.*, the number of African Americans who would have effectively passed if a test with no disparate impact had been administered). Had the rank-order use of the ACCUPLACER not had a disparate impact on African Americans, I estimate that seven (7) African Americans would have been hired as firefighters pursuant to the 2020 hiring process.

9

14. I also reviewed CCFD's use of the ACCUPLACER in 2021, when it only used the ACCUPLACER as a pass-fail screen and began using a randomizer to select which individuals who passed the ACCPLACER and physical agility test move forward in the hiring process. CCFD's use of the ACCUPLACER in this manner did not result in any statistically significant disparity against African-American firefighter candidates in terms of moving forward in the hiring process and in terms of individuals selected for hire.

## CREDIT CHECK

15. CCFD's use of the credit check between 2016 and 2020 had a statistically and practically significant disparate impact upon African-American firefighter candidates. The disparity between the credit check pass rate of African-American and White candidates is equivalent to 6.29 units of standard deviation. The probability of this statistically significant disparity occurring by chance is incredibly small.

16. The disparities resulting from the credit check are also practically significant. There is a shortfall of 34 African-American credit check passers. Had the credit check not had a disparate impact on African Americans, I estimate that ten (10) additional African Americans would have been hired as firefighters pursuant to the 2016 through 2020 hiring processes.

17. In total, I identified 213 unique African-American candidates disqualified by the rank-order use of the ACCUPLACER in 2020 or by the credit check between 2016 and 2020.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 24, 2024.

*Bernard R. Siskin*

_____

Bernard R. Siskin

# EXHIBIT 1

# BLDS, LLC

**Bernard R. Siskin, Ph.D.**
Director

1608 Walnut Street
Suite 1108
Philadelphia, PA  19103  USA

Main:  215.717.2320
Fax:    215.717.2324
Email: bsiskin@bldsllc.com

**SUMMARY**

Bernard Siskin received his B.S. degree in Mathematics from the University of Pittsburgh and a Ph.D. in Statistics from the University of Pennsylvania.  For many years, he taught statistics at Temple University and served as Chairman of the Department of Statistics.

Dr. Siskin has specialized in the application of statistics in law, particularly in the area of analyzing data for statistical evidence of discrimination.  He has testified for both plaintiffs and defendants in more than 300 cases, many of which were large employment class actions.  In addition to discrimination studies, he has conducted statistical studies and has testified in commercial and environmental cases involving statistical issues.

Dr. Siskin has frequently been appointed by federal judges as a neutral expert to aid the court in statistical issues and he was the statistical consultant to the Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts.

Dr. Siskin is the author of many articles and textbooks on statistics and quantitative techniques including *Elementary Business Statistics, Encyclopedia of Management* and *Quantitative Techniques for Business Decisions.*  He has also written and lectured extensively on the use of statistics in litigation.

He has served as a statistical consultant to the U.S. Department of Justice, the Equal Employment Opportunity Commission, the U.S. Department of Labor, the Federal Bureau of Investigation, the Central Intelligence Agency, the Environmental Protection Agency, the National Aeronautics and Space Administration, Consumer Financial Protection Bureau (CFPB), OFCCP and Fannie Mae (the Federal National Mortgage Association) and Freddie Mac (the Federal Home Loan Mortgage Corporation), as well as numerous other federal, state and city agencies and Fortune Five Hundred corporations.

# BLDS, LLC

**EDUCATION**
University of Pennsylvania
Ph.D., Statistics (Minor, Econometrics), 1970

University of North Carolina
Graduate Study (Major, Economics; Minor, Statistics), 1966

University of Pittsburgh
B.S., Mathematics (Minor, Economics), 1965


**PRESENT POSITION**
BLDS, LLC, Director, 2011


**TEACHING EXPERIENCE**
Temple University, Adjunct Professor of Law School, 1992 to 2005
Temple University, Tenured Associate Professor of Statistics, 1973 to 1984
Temple University, Chairman-Department of Statistics, 1973 to 1978
Temple University, Assistant Professor of Statistics, 1970 to 1973
Temple University, Instructor of Statistics, 1968 to 1970


**OTHER POSITIONS HELD**
LECG, Director, 2003 to 2011
Center for Forensic Economic Studies, Senior Vice President, 1991 to 2003
National Economic Research Associates, Inc., Senior Vice President, 1989 to 1991
National Economic Research Associates, Inc., Vice President, 1986 to 1989
Center for Forensic Economic Studies, Ltd., President, 1984 to 1986
Center for Forensic Economic Studies, Ltd., Consultant, 1980 to 1984


**PUBLICATIONS**
Books
1. B. Siskin and N. Schmidt, "Proper Methods for Statistical Analysis of Promotions," *Adverse Impact Analysis: Understanding Data, Statistics, and Risk*, Psychology Press, 2017, S. Morris and E. Dunleavy, eds.
2. B. Siskin, "Employment Discrimination Litigation: Behavioral, Quantitative, and Legal Perspectives" John Wiley & Sons, Inc. 2005, Chapter 5 *Statistical Issues in Litigation* (with Joseph Trippi).
3. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants: A Study of One Lending Institution," *Mortgage Lending, Racial Discrimination and Federal Policy*, Urban Institute Press, 1996, J. Georing and R. Wienk, eds.
4. B. Siskin and J. Staller, *What Are The Chances?,* Crown Publishers, 1989.

# BLDS, LLC

**PUBLICATIONS (Continued)**

Books (Continued)

5. B. Siskin and R. Johnson, *Elementary Statistics: A First Course*, Duxbury Press, 1982.
6. B. Siskin and R. Johnson, *Elementary Business Statistics*, Duxbury Press, 1979 2nd Edition, 1985
7. B. Siskin, *Encyclopedia of Management*, McGraw Hill, 1979. (Ed. Les Bechtel).
8. B. Siskin and R. Johnson, *Quantitative Techniques for Business Decisions*, Prentice Hall, 1976.

**ARTICLES (Partial List Since 1993)**

1. B. Siskin, N. Schmidt & B. Stephens, "Algorithmic Credit Scoring and FICO's Role in Developing Accurate, Unbiased, and Fair Credit Scoring Models," *Credit Scoring & FICO Quarterly Report* Vol. 75, No. 3 2021.
2. B. Siskin and D. Griffin, "Litigating Employment Discrimination & Sexual Harassment Claims," *Litigation Handbook Series*, 2002.
3. B. Siskin, H. Carter, V. Lee, G. Page, M. Parker, R.G. Ford, G. Swartzman, S. Kress, S. Singer and D.M. Fry, "The 1986 Apex Houston Oil Spill in Central California: Seabird Mortality and Population Impacts, Injury Assessments, Litigation Process, and Initial Restoration Efforts," *Marine Ornithology*, 2002.
4. B. Siskin, AUtilizing Statistics in Discrimination Cases,@ *Litigation Handbook Series*, 2001.
5. B. Siskin, B. Sullivan, J. Staller, and E. Hull, ADefending and Proving Damages in Employment Discrimination Cases,@ *Litigation Handbook Series*, 2000.
6. B. Siskin, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1998.
7. B. Siskin and D. Kahn, "Litigating Employment Discrimination Cases," *Litigation Handbook Series*, 1997.
8. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze ARandom Workplace Drug Testing. Does It Primarily Identify Casual or Regular Drug Users?,@ *Employment Testing Law & Policy Reporter*, Vol. 4, Number One, 1995.
9. B. Siskin, R. DuPont, D. Griffin, S. Shiraki, and E. Katze "Random Drug Tests at Work: The Probability of Identifying Frequent and Infrequent Users of Illicit Drugs," *Journal of Addictive Diseases*, Vol. 14, Number 3, 1995.
10. B Siskin, J. Staller, B. Sullivan and L. Freifelder, "Litigating Employment Discrimination Cases," *Litigation Course Handbook Series*, 1995.
11. B. Siskin, "Comparing the Role of Statistics In Lending and Employment Cases," *Fair Lending Analysis: A Compendium of Essays on the Use of Statistics*, American Bankers Association, 1995.
12. B. Siskin, "Relationship Between Performance and Banding," *Human Performance*, Vol. 8, No. 3, July 1995.
13. B. Siskin, "Statistical Issues in Litigating Employment Discrimination Claims," *Federal Publications*, 1993.
14. B. Siskin, "Use of Statistical Models to Provide Statistical Evidence of Discrimination in the Treatment of Mortgage Loan Applicants: A Study of One Lending Institution," *Discrimination and Mortgage Lending Research and Enforcement Conference* Department of Housing and Urban Development, May 1993.

# BLDS, LLC

**SPEECHES (Partial List)**

1. Alabama Bar Association
2. American Bar Association
3. American Financial Services Association
4. American Statistical Association
5. Defense Research Institute
6. Federal Bar Association
6. Harvard University
7. Institute of Industrial Research
8. International Organization of Human Rights Association
9. Law Education Institute
10. Law Enforcement Assistance Administration
11. Michigan Bar Association
12. National Center on Aging
13. Ohio Bar Association
14. Penn State University
15. Pennsylvania Human Relations Commission
16. Practising Law Institute
17. Security Industry Association
18. Women's Law Caucus:  National Conference

**STATISTICAL CONSULTANT (Partial List)**

1. Attorney General's Office of the Commonwealth of Pennsylvania, and states of California, Oregon, Massachusetts, Connecticut, Mississippi, Louisiana and New Jersey
2. Board of Higher Education for Massachusetts and Oregon
3. Central Intelligence Agency (CIA)
4. Environmental Protection Agency (EPA)
5. Equal Employment Opportunity Commission (EEOC)
6. Federal Bureau of Investigation (FBI)
7. Freddie Mac (Federal Home Loan Mortgage Corporation)
7. Fannie Mae (Federal National Mortgage Association)
8. Homeland Security
9. International Organization of Human Rights Associations
10. Municipal Court of Philadelphia
11. National Aeronautics and Space Administration (NASA)
12. Office of Federal Contract Compliance, Department of Labor (OFCCP)
13. Pennsylvania Human Relations Commission
14. Security Exchange Commission
15. Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts
16. U.S. Department of Agriculture
17. U.S. Department of Commerce
18. U.S. Department of Labor
19. U. S. Justice Department
20. Numerous Fortune 500 and other private corporations